UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL ACTION NO. 14-169-DLB-CJS

ARROWOOD INDEMNITY COMPANY                                    PLAINTIFF

vs.                          MEMORANDUM OPINION AND ORDER

THE DREES COMPANY, et al.                                     DEFENDANTS

****************

Plaintiff Arrowood Indemnity Company ("Arrowood") commenced this action against Defendant, the Drees Company ("Drees"), pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.  Arrowood seeks a ruling that it has no obligation to defend or indemnify Drees in connection with a state court lawsuit filed by Co-Defendant, the Summits Council of Co-Owners, Inc. (the "Summits").  The parties were ordered to submit memoranda addressing whether the Court should hear this matter based on the *Grand Trunk* factors. Having carefully considered the parties' arguments, and for the reasons set forth below, the Court finds it appropriate to decline jurisdiction in this case.  Accordingly, Arrowood's amended complaint and the Summits' counter-claim are dismissed without prejudice.

I.      Factual and Procedural Background

Drees is a homebuilding company with its principal place of business located in Ft. Mitchell, Kentucky.  (Doc. # 6 at 2, ¶ 2).  From 1993 through 2000, Drees developed a multi-phase condominium project in Florence, Kentucky, known as the Summits of

Oakbrook (the "Condos"). (*Id.* at 2, ¶ 8).   The Summits is a non-profit corporation responsible for the overall administration of the Condos.   (Doc. # 19-1 at 2, ¶ 4).   It is tasked with ensuring that certain areas of the Condos are properly maintained, "including, but not limited to, the foundations, main walls, roof, halls, basements, and 'all other elements of or on the property rationally of common use or necessary to the existence, upkeep, and safety of the owners and of the [Condos].'" (*Id.*)

On or about August 27, 2012, the Summits filed a lawsuit against Drees in the Boone Circuit Court, alleging that water had penetrated the exterior of the Condos, causing structural and other damages in excess of $750,000 (the "Summits Lawsuit").[1]   (*Id.* at 2-3, ¶ 9).   The complaint brings four separate causes of action, stating that Drees: (1) breached an implied warranty that the Condos were built in a workmanlike manner using suitable materials; (2) constructed the Condos in such a way that violated the Uniform State Building Code and/or other applicable building codes; (3) breached its duty to construct the Condos in a non-negligent manner using reasonable care; and (4) incorporated numerous defective products in building the Condos. (*Id.* at 2-5, ¶¶ 6-24).   The Summits Lawsuit has been ongoing for more than two years.   (Doc. # 14 at 1).   Both parties have taken considerable discovery.   (*Id.* at 6).

Arrowood is one of Drees' various liability insurers.   Arrowood is defending Drees in the Summits Lawsuit pursuant to a commercial general liability ("CGL") policy, issued by the Royal & Sun Alliance Group (the "Royal Policy"), a company that Arrowood purchased in 2007.   (Doc. # 6 at 2, ¶ 7).   The defense being provided to Drees is subject to a

---

[1] The alleged damages pertain to several aspects of the Condos, including "[the] windows, balconies, decks, doorways, flashing, gutters, and/or siding." (Doc. # 19-1 at 2-3, ¶ 9).

2

reservation of rights letter, sent by Arrowood on December 20, 2012.  (Doc. # 6 at 4, ¶ 13).

Arrowood filed the instant declaratory judgment action on September 18, 2014. (Doc. # 1).  According to the complaint, the Condos were not built, nor could the alleged water penetration have occurred, "during the period when the Royal Policy was in force and effect."  (Doc. # 6 at 9, ¶ 24); (Doc. # 6 at 10, ¶ 30).  Additionally, Arrowood asserts that claims of faulty workmanship are not covered by CGL insurance as a matter of law.  (Doc. # 6 at 9, ¶ 26).  Based on these arguments, Arrowood maintains that "[t]here are no allegations against Drees in the Summits Lawsuit of any occurrences or property damages that would trigger coverage under the Royal Policy."  (Doc. # 6 at 10, ¶ 31).

Arrowood's position in this matter implicates the following provisions and definitions within the Royal Policy:

Section I - Coverages

1. Insuring Agreement.

> a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may at our discretion investigate any "occurrence" and settle any claim or "suit" that may result.

> b.  This insurance applies to "bodily injury" and "property damage" only if:

>> (1)  The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

>> (2)  The "bodily injury" or "property damage" occurs during the policy period.

<u>Section V - Definitions</u>

8.     "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

(Doc. # 6-1 at 35, 45).[2]

## II.    Analysis

### 1.     Standard of Review

The Declaratory Judgment Act states that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, *may* declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a) (emphasis added).  Federal courts are "under no compulsion to exercise [ ] jurisdiction." *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491, 494 (1942).  Rather, the Act affords "unique and substantial discretion" in deciding whether to provide declaratory relief.  *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995).  To guide this discretion, however, the Sixth Circuit has identified five factors for district courts to consider:

(1)     whether the declaratory action would settle the controversy;

(2)     whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue;

(3)     whether the declaratory remedy is being used merely for the purpose of procedural fencing or to provide an arena for a race for *res judicata*;

(4)     whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach on state jurisdiction; and

---

     [2]  These provisions and definitions are contained within Royal Insurance Policy # ATL-4398680000.  (Doc. # 6-1 at 1).

(5)    whether there is an alternative remedy which is better or more effective.

*Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 554 (6th Cir. 2008) (quoting *Grand Trunk W. R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984)) (internal quotations omitted).

The above factors, often called the *Grand Trunk* factors, are based on three guiding principles: efficiency, fairness and federalism. *Western World Ins. Co. v. Hoey, et al.*, Case No. 13-2388, 2014 WL 6865300 at *2 (6th Cir. Dec. 8, 2014). Since the relevance of these principles will vary depending on the circumstances of each case, courts should not assume that the *Grand Trunk* factors are equally weighted. *Id.* As the Sixth Circuit explained in *Hoey*, "a relatively efficient declaratory judgment (factors 1, 2, and 5) could very well be inappropriate if hearing the case would be unfair (factor 3) or would offend the bundle of principles we generally label 'federalism' (factor 4)." *Id.* Thus, in lieu of issuing specific guidelines for balancing the *Grand Turk* factors, the Sixth Circuit has reiterated that "[t]he essential question is always whether a district court has taken a good look at the issue and engaged in a reasonable analysis of whether issuing a declaration would be useful and fair." *Id.*

## 2.    **Grand Trunk Factors**

### a.    *Will the declaratory action settle the controversy?*

There is a split in authority within the Sixth Circuit regarding the first factor. One line of cases holds that "a declaratory relief action can settle the insurance coverage controversy not being addressed in state court, even though it will not help resolve the underlying state court action." *Scottsdale*, 513 F.3d at 555 (citing *Northland Ins. Co. v.*

5

*Stewart Title Guar. Co.*, 327 F.3d 448, 454 (6th Cir. 2003); *Allstate Ins. Co. v. Green*, 825 F2d 1061, 1066 (6th Cir. 1987)).  A separate line of cases has concluded that "while such declaratory actions might clarify the legal relationship between the insurer and the insured, they do not settle the ultimate controversy between the parties which is ongoing in state court." *Id.* (citing *Travelers Indem. Co. v. Bowling Green Prof'l Assoc., PLC*, 495 F.3d 266, 272 (6th Cir. 2007); *Bituminous Cas. Corp. v. J & L Lumber Co.*, 373 F.3d 807, 814 (6th Cir. 2004)).

The contrary results in these cases are best explained in terms of their distinct factual circumstances.  In *Northland*, for instance, "the plaintiff was not a party to the state court action and neither the scope of the insurance coverage nor the obligation to defend was before the state court."  *Id.* at 556 (internal quotations omitted).  In *Bituminous*, however, "the insurance coverage controversy rested on a fact-based question of state law regarding whether the plaintiff in the state action was actually an employee of the defendant," which was already being considered in two separate state court proceedings. *Id.* at 555-56.

Similar to the *Northland* case*,* the party who instituted this declaratory action, Arrowood, is not named in the underlying state court matter.  Therefore, as Arrowood notes its memorandum, the insurance coverage dispute before this Court will never be directly at issue in the Summits Lawsuit.  However, this fact alone does not necessarily mean that declaratory relief would settle the controversy.  In keeping with the second line of precedent discussed above, the Court will also examine whether the scope of insurance coverage depends on fact-based questions of state law, and, if so, whether those same questions are likely to be addressed by the Boone Circuit Court.  In order to properly assess these

6

issues, it is helpful to first review the functional aspects of the insurance policy in question.

The Royal Policy provides that it will cover amounts "that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." (Doc. # 6-1 at 35).  Coverage applies only if the "'bodily injury' or 'property damage' is caused by an 'occurrence'." (*Id.*)  An occurrence is defined as "an *accident*, including continuous or repeated exposure to substantially the same general harmful conditions."  (*Id.* at 45) (emphasis added).  Importantly, however, the term "accident" is left undefined.

Turning to the parties' arguments, Arrowood contends that the dispute over insurance coverage can be settled primarily as a matter of law.  In one respect, the Court agrees.  According to the complaint, the Royal Policy was not in effect when the Condos were originally built, or when the water penetration supposedly occurred.  The timing of these events in relation to the period of coverage is not germane to the underlying state court matter; thus, to establish such facts in connection with this lawsuit would not be duplicative.  And, if Arrowood happened to be correct, the Court could easily resolve this matter based on well-settled principles of contract law.[3]

However, the Court must consider how its analysis would change if Arrowood was incorrect.  Assuming the coverage *was in effect* at the appropriate times, the central issue would then become whether Drees' alleged conduct qualifies as an "occurrence" under the

---

[3] Indeed, unless the Royal Policy was in effect when the events in question took place, Drees would not have a legitimate claim to coverage.  Surprisingly, though, Arrowood's complaint excludes any indication as to when the events occurred. It also fails to specify the Royal Policy's effective period of coverage.  Therefore, at this juncture, the Court is fairly skeptical regarding this premise for declaratory relief.

Royal Policy.  Yet again, Arrowood asserts that this issue can be fully resolved as a matter of law.  In support of this assertion, Arrowood cites *Cincinnati Ins. Co. v. Motorists Mut. Ins. Co.*, a case in which the Kentucky Supreme Court generally held that "claims of faulty workmanship, *standing alone*, are not 'occurrences' under CGL policies." 306 S.W.3d 69, 73 (Ky. 2010) (emphasis added).

In *Cincinnati*, homeowners brought suit against their homebuilder for faulty workmanship, alleging their house was so poorly built that it eventually had to be demolished.  *Id.* at 71.  The question before the court was whether such a claim qualified as an "occurrence" under the homebuilder's CGL policy.  Like the Royal Policy, the policy in *Cincinnati* defined an occurrence as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  *Id.* at 72.  Because the term "accident" was left undefined, the court relied on the doctrine of fortuity, explaining that in order for an event to be accidental, not only must it have been unintentional from the standpoint of the insured, but it must also have been "beyond the power of any human being to bring . . . to pass, . . . [or] within the control of third persons."  *Id.* at 76.  The court found that the construction process was controlled entirely by the homebuilder and/or its subcontractors, and therefore held that the alleged damages did not qualify as an occurrence under the CGL policy.  *Id.*

The United States District Court for the Western District of Kentucky commented on *Cincinnati's* holding in *Westfield Ins. Co. v. B.H. Green & Son, Inc.*, Case No. 11-CV-10, 2013 WL 5278243 (W.D. Ky. Sept. 18, 2013).  The insured in *Westfield*, a construction company, was being sued in state court for using defective concrete while building an elementary school.  *Id.* at *1.  Again, the CGL policy defined an occurrence as an

8

"accident," but gave no indication as to what makes something accidental.  *Id.* at *3.
Pursuant to *Cincinnati*, the court considered whether or not the alleged damages were
caused fortuitously.  *Id.* at *4.  In doing so, however, the court emphasized that the holding
in *Cincinnati* "hinged on the fact that the subcontractors' defective workmanship was both
observable and controllable by the insured party throughout construction."  *Id.*  The court
then distinguished its own set of facts, noting that the defective concrete used by the
construction company adhered to the specifications set forth by school board officials.  *Id.*
The court concluded that "[b]ecause the elements contributing to the concrete's impairment
were thoroughly beyond [the insured's] control, the resultant damage to the building is
properly characterized as a fortuitous event and ultimately an 'accident.'"  *Id.* at *5.[4]

      Despite Arrowood's assertion to the contrary, the holding in *Cincinnati* is far too
narrow to settle this controversy as a matter of law.  To begin with, the claim against Drees
for faulty workmanship does not "stand alone."  It is but one of four separate claims.
Furthermore, the allegation that Drees used defective materials in constructing the Condos
makes this case highly similar to *Westfield*.  Thus, in order to determine whether the
alleged damages came about fortuitously, the Court would need to understand Drees' level
of control over the events that caused the materials to become impaired.  At a minimum,
this would require factual findings as to who supplied the materials and whether they were

---

      [4] Based on similar rationale, courts in our sister circuits have ruled that damages resulting
from hidden defects are also accidental in nature.  *See, e.g., Irving Materials, Inc. v. Zurich Am. Ins.
Co.*, Case No. 3-361, 2007 WL 1035098, at *15 (S.D. Ind. Mar. 30, 2007) (holding that damages
caused by a defective component in the insured's concrete mix were "unexpected" and therefore covered
as an accident under the CGL policy); *Amerisure Mut. Ins. Co. v. Paric Corp.*, Case No.
4-430, 2005 WL 2708873, at *6 (E.D. Mo. Oct. 21, 2005) (holding that the allegations against the
insured were sufficient to constitute an occurrence due to the "hidden nature of the defects" and
because the insured "did not intend, expect or desire that the [insulation] or the windows would
leak").

properly inspected; what the nature of the impairment was; and whether Drees used the materials based on its own discretion, or pursuant to the Summits' specifications.[5] The Court is confident that these facts will also be highly relevant to the underlying state court matter, particularly with respect to the negligence claim, as they speak to such issues as the standard of care, causation and comparative fault.

In summary, to provide the declaratory relief that Arrowood requests, the Court will most likely have to determine if Drees' actions constitute an "occurrence" under the Royal Policy. The cases above make clear that this determination will inevitably raise fact-based questions of state law, namely, whether or not the events giving rise to the alleged damages came about fortuitously. Given the nature of the various claims at issue in the Summits Lawsuit, there is a strong possibility that many of these same factual questions will also be addressed by the Boone Circuit Court. Therefore, consistent with the Sixth Circuit's holding in *Bitiminous*, the Court finds that a declaratory judgment in this matter would not settle the controversy. Accordingly, the first factor weighs against exercising jurisdiction.

b. *Will the declaratory action clarify the legal relations at issue?*

There is also a split within Sixth Circuit precedent regarding the second factor. The issue is whether "the district court's decision must only clarify the legal relations presented in the declaratory judgment action or whether it must also clarify the legal relations in the

---

[5] Seeing as the Condos were built for commercial sale, it is certainly plausible that the party who originally purchased them might have had some level of control in selecting the materials that Drees used. This is particularly true considering the nature of the areas that were allegedly damaged, which include "windows, balconies, decks, doorways, flashing, gutters, and/or siding." (Doc. # 19-1 at 2-3, ¶ 9).

underlying state action." *Scottsdale*, 513 F.3d at 557. Although the *Scottsdale* court did not definitely resolve this split, it "f[ou]nd the former line of precedent to be more persuasive than the latter." *Id.* As a result, the court focused on "the ability of the federal declaratory judgment to resolve, once and finally, the question of the insurance indemnity obligation of the insurer." *Id.* Moreover, the court explained that a declaratory action need not also clarify the legal relations in the state court lawsuit, so long it "d[oes] not create any confusion about the resolution of those issues." *Id.*

Here, the Court is asked to decide one discrete issue: whether Arrowood has a contractual obligation to defend or indemnify Drees. Although a ruling on this issue would not settle the controversy, it would nonetheless clarify the relationship between Arrowood and Drees. And because the scope of insurance coverage is not being litigated in the Summits Lawsuit, there is no risk that the ruling would be duplicated, or contradicted.[6] Moreover, all of the parties to the underlying state court matter have been named in this action. In fact, the Summits has filed a counter-claim against Arrowood, requesting declaratory relief in Drees' favor. Given the limited number of parties overall (there are only three), and because the Summits is involved with both the federal and state actions, the Court finds that a federal declaratory judgment would be unlikely to confuse the legal relations of the parties involved in the state court proceeding. For these reasons, the second factor weighs in favor of exercising jurisdiction.[7]

---

[6] Of course, many of the factual findings in support of that ruling would likely be duplicated or contradicted; however, that is a consideration under the first factor, which the Court has already addressed.

[7] The Court recognizes that the first and second factors are closely intertwined. "Indeed, it is almost always the case that if a declaratory judgment will settle the controversy, then it will

11

c.   *Is the declaratory remedy being used for the purpose of procedural fencing or to provide an arena for res judicata?*

The third factor is intended to "preclude jurisdiction for 'declaratory plaintiffs who file their suits mere days or weeks before the coercive suits filed by a natural plaintiff and who seem to have done so for the purpose of acquiring a favorable forum." *Scottsdale*, 513 F.3d at 558. Yet, district courts recognize that it is unfair to "deny jurisdiction to a plaintiff who has not 'done any more than choose the jurisdiction of federal rather than state court, a choice given by Congress.'" *Id.* In fact, where the declaratory action is filed *after* the state court litigation has begun, courts generally give the plaintiff "the benefit of the doubt that no improper motive fueled the filing of [the] action." *Id.*

Drees asserts that Arrowood is "brazenly forum shopping" because it "could easily have filed its declaratory judgment action in the state court, and moved to consolidate with the pending Summits case." (Doc. # 14 at 5). However, the Court sees no direct evidence to bolster this assertion, and the Sixth Circuit has advised against "imput[ing] an improper motive to a plaintiff where there is no evidence of such in the record." *Id.* at 558. Also, the Summits Lawsuit was filed more than two years ago, which means that Arrowood is presumed not to have brought this action for the purpose of acquiring a favorable forum. Taking these circumstances into account, the Court finds that Arrowood is not using the declaratory remedy as a means for procedural fencing.

---

clarify the legal relations in issue." *Id.* at 557. Yet, it is not unheard of for the second factor to support exercising jurisdiction, while the first factor does not. *See Grange Mut. Cas. Co. v. Safeco Ins. Co. of Am.*, 565 F. Supp. 2d 779, 789 (E.D. Ky. 2008); *State Auto Ins. Co. v. Kennedy Homes, LLC*, Case No. 09-178, 2011 WL 65880, at *4 (E.D. Ky. Jan. 10, 2011).

The parties' only remaining dispute is whether the absence of procedural fencing should be weighed as a neutral or positive factor. But in this case, the distinction is immaterial. Even if the Court weighed this factor favorably, it would only be of slight concern as the remaining factors are so heavily implicated.

  d. <u>Would a declaratory action increase friction between our federal and state courts?</u>

While "'the mere existence of a state court proceeding is not determinative of improper federal encroachment upon state jurisdiction,'" district courts must be careful if there is another suit pending in state court that involves the same parties and presents opportunity for ventilation of the same state law issues raised in the declaratory judgment action. *Scottsdale*, 513 F.3d at 559-60. Courts should focus on three sub-factors in evaluating the risk of friction between federal and state courts:

> (1) whether the underlying factual issues are important to an informed resolution of the case;
>
> (2) whether the state trial court is in a better position to evaluate those factual issues than is the federal court; and
>
> (3) whether there is a close nexus between underlying factual and legal issues and state law and/or public policy, or whether federal common or statutory law dictates a resolution of the declaratory judgment action.

*Id.*

The first sub-factor considers "whether the state court's resolution of the factual issues in the case is necessary for the district court's resolution of the declaratory judgment action." *Id.* at 560. In cases dealing with the scope of insurance coverage, some questions can be resolved as a matter of law and do not require factual findings. *Id.* (citing *Northland*

13

*Ins. Co. v. Stewart Title Guar. Co.*, 327 F.3d 448, 454 (6th Cir. 2003)).  However, if factual findings are required that might conflict with factual findings by the state court, the exercise of jurisdiction is inappropriate.  *Id.*  (citing *Travelers*, 495 F.3d at 272).

Arrowood reiterates its position that this declaratory action can be fully resolved as a matter of law based on the holding in *Cincinnati*.  For the reasons set forth in detail above, the Court disagrees.  Numerous factual findings will be necessary in order to decide if Drees' actions qualify as an occurrence under the Royal Policy.  Given the nature of the various claims being litigated, the Court strongly believes that many of the same factual findings will be at issue in the Summits Lawsuit.  Because there is a reasonable possibility that this Court's findings would conflict with those of the Boone Circuit Court, the first sub-factor weighs against exercising jurisdiction.

The second sub-factor considers which court is in a better position to resolve the declaratory action.  *Id.*  Generally, state courts are better situated than federal courts to resolve disputes over state regulated insurance contracts and novel questions of state law.  *See Travelers*, 495 F.3d at 272; *Bituminous*, 373 F.3d at 815-16.  However, when the insurance company is not a party to the state action, and the scope of coverage or an obligation to defend are not before the state court, "a decision by the district court on these issues would not offend principles of comity."  *Scottsdale*, 513 F.3d at 560 (quoting *Northland Ins. Co.*, 327 F.3d at 454).

Despite the fact that Arrowood is not named in the Summits Lawsuit, and even though the dispute over insurance coverage is not at issue in that action, the second sub-factor still weighs against exercising jurisdiction.  Based on clear Sixth Circuit

14

precedent, a Kentucky court is better situated than this Court to adjudicate matters that revolve around state regulated insurance contracts. And, while insurance coverage in general is not a novel question of state law, this case is fairly unique given the combination of claims being asserted. As a result, deciding whether any of Drees' actions warrant coverage under the Royal Policy will require a careful examination of the facts, and because discovery is well underway in the Summits Lawsuit already, this process is best left to the Boone Circuit Court.

Finally, the third sub-factor asks "whether the issue in the federal action implicates important state policies and is, thus, more appropriately considered in state court." *Id.* at 561. The Sixth Circuit has observed that "states regulate insurance companies for the protection of their residents, and state courts are best situated to identify and enforce the public policies that form the foundation of such regulation." *Id.* As such, insurance contract disputes normally involve "questions of state law with which the Kentucky state courts are more familiar and, therefore, better able to resolve." *Id.*

As discussed above, the doctrine of fortuity will most likely play a key role in shaping the outcome of this case. When applying this doctrine to decide whether a claim should be covered, Kentucky courts have consistently supported their decisions with policy considerations, such as the overall purpose of CGL insurance, the expectations of the insured and the goal of discouraging negligent conduct. *See, e.g., Cincinnati Ins. Co. v. Motorists Mut. Ins. Co.*, 306 S.W.3d 69, 74-76 (Ky. 2010) (discussing the various policy considerations at play in deciding whether or not an event should be deemed accidental); *Bituminous Cas. Corp. v. Kenway Contracting, Inc.*, 240 S.W.3d 633, 638-40 (Ky. 2007) (same). Although this Court is certainly capable of weighing such policy concerns in

relation to the instant matter, the controlling authority unequivocally states that a Kentucky court is better situated to handle this task.  Accordingly, the third sub-factor also weighs against exercising jurisdiction.

Seeing as all three sub-factors suggest that hearing this case would create friction between our federal and state court systems, the fourth factor weighs against exercising jurisdiction.

e.    <u>*Is there an alternative remedy that is better or more effective?*</u>

Federal declaratory plaintiffs typically have two alternative remedies: (1) seek declaratory judgment in Kentucky state court pursuant to KRS § 418.040; or (2) file an indemnity action at the conclusion of the state court lawsuit.  *Scottsdale*, 513 F.3d at 562. When evaluating whether either of these remedies is better or more effective, the court's inquiry "must be fact specific, involving consideration of the whole package of options available to the federal declaratory plaintiff."  *Id.*

Arrowood posits that a federal declaration would be most effective because it would not have to "wait until the liability issue in the [Summits Lawsuit] is resolved before determining its obligation towards Drees."  (Doc. # 12 at 9).  While Arrowood is likely correct that this Court could provide a remedy more quickly than the Boone Circuit Court, a speedy judgment is useless if it comes at the cost of federalism.  Given the significant friction that a federal declaration would create between the state and federal court systems, discussed *supra*, the Court is almost certain that any gains in efficiency would be quickly undone on appeal.  Ultimately, the most effective remedy is the one that is likely to endure – and here, that is a declaratory judgment rendered by a Kentucky state court.

There is one additional and significant drawback to a federal declaration worth mentioning.  Drees has stated in its brief that it will soon move for summary judgment in the state court action on the basis that the Summits' claims are time-barred.  (Doc. # 14 at 1).[8] If Drees' motion is granted, then a declaratory judgment from this Court would prove a waste of judicial resources.  In light of this prospect, it is best that the court providing declaratory relief be familiar with the status of this potentially dispositive motion.  For this reason, and the reasons noted above, a declaratory action in the Boone Circuit Court is the most effective remedy.  Accordingly, the fifth factor weighs against exercising jurisdiction.

In summary, the second factor points toward exercising jurisdiction, and the third factor is effectively neutral.  However, the first, fourth and fifth factors strongly weigh against exercising jurisdiction.  As such, the Court finds it appropriate to decline jurisdiction in this matter.

## III.   Conclusion

Accordingly, for the reasons stated herein,

**IT IS ORDERED** that this matter be, and is, hereby **DISMISSED** and **STRICKEN** from the Court's active docket.

This 9th day of January, 2015.



Signed By:

_David L. Bunning_

**United States District Judge**

G:\DATA\Opinions\Covington\2014\14-169 MOO dismissing complaint.wpd

---

[8] The Court has confirmed that Drees did file this motion on December 11, 2014.

17